## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

JASON DUNKELBERGER,

    Plaintiff,

vs.

Case 4:20-CV-04086-LLP

JOHN STORY, STATE MACHINE SHOP SUPERVISOR AT SD STATE PENITENTIARY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; MARCUS DITSWORTH, STATE TEMP. SUPERVISOR AT SDSP MACHINE SHOP, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; AND JOHN DOES, UNKNOWN EMPLOYEES OR OTHERS TO BE KNOWN, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES,

    Defendants.

Deposition of JASON DUNKELBERGER, the plaintiff herein, taken on behalf of the defendants Story and Ditsworth herein, beginning at 12:44 p.m. on Friday, July 16, 2021, at Mike Durfee State Penitentiary, 1412 Wood Street, Springfield, South Dakota.

APPEARANCES

JASON DUNKELBERGER, Plaintiff,

    Appearing pro se;

DOUGLAS A. ABRAHAM, Attorney at Law
503 South Pierre Street
PO Box 160
Pierre, South Dakota  57501-0160
(605) 224-8803

    Appearing on behalf of defendants Story and Ditsworth.

    Also present: Leon Ellis, SD Office of Risk Management.

    Reported by: Mary Anne Meyer, RDR

## Page 2

I N D E X

JASON DUNKELBERGER

| | |
|---|---|
| Examination by Mr. Abraham | 3 |
| End of deposition at 1:57 p.m., 7-16-21 | 61 |

INDEX TO EXHIBITS

| Number and Description | Marked |
|---|---|
| 1. Document 1, Civil Rights Complaint by a Prisoner, with attachments (26 pp) | 16 |
| 2. Group of photographs with attached Report of Accident, Incident, or Unsafe Condition (6 pp) | 31 |
| 3. Machine Shop Tool and Equipment Safety and Operation Sheets (2 pp) | 21 |

## Page 3

JASON DUNKELBERGER was duly sworn and testified as follows:

EXAMINATION

Q (BY MR. ABRAHAM) We didn't really get through introductions there, Jason -- or Mr. Dunkelberger. I'm Doug Abraham. I represent defense in relation to a matter that you filed, so it's John Story and Marcus Ditsworth. Just so you understand that's the reason why we're here.

A Yep.

Q Did you get a deposition notice in the mail?

A Yes.

Q Okay. You understand you've been sworn, so you're under oath --

A Yes.

Q -- for purposes of this deposition. Have you ever had your deposition taken before?

A No.

Q Okay. I'll just go over kind of some brief ground rules. For purposes of the deposition, it's easiest -- I know conversationally it's easy to respond right away and you know where I'm going with questions, but to the extent you can wait until I finish my question, it will provide a clearer record.

A Yep.

Q Fair enough?

## Page 4

A Fair enough.

Q And I'll make sure that I give you an opportunity to fully answer the question before I ask the next one.

A Okay.

Q I would say if you need to take a break for restroom or whatever it may be, let me know, but I'm not sure how that works here otherwise.

    I'm going to ask at least a few bad questions, so if you don't understand what I'm asking, just ask me to restate it. I'm more than happy to. The most important thing for the record is that we're understanding each other and we get a clear record.

A (Moves head in affirmative manner.)

Q Is that fair?

A Yep, that's fair.

Q The other aspect -- and you were nodding your head. People do, and it's normal conversation, but it doesn't go down on the record necessarily very well. To the extent you can respond --

A Yes or no.

Q -- vocally -- and, you know, you can answer the question however you deem appropriate, but to the extent it's vocal and verbal so she can take it down as a record --

A Okay.

Q -- it will make a cleaner record.

EXHIBIT 4

(1) Pages 1 - 4

Page 25

1  A  John Story.
2  Q  Exhibit 3, pages 1 and 2, who did you receive those forms
3     from?
4  A  1 and 2? This one here was provided me from John Story
5     first, and I erased it, so I got this one because it was
6     the new copies he had. And the back one of Exhibit 3 was
7     given to me by Elledge, because he had -- he went through
8     all the tool stuff and had everybody sign the new sheets,
9     make sure everybody was trained on the machines.
10 Q  Okay. Do you ever have access to a computer when you're
11    at the penitentiary?
12 A  No, none. No phones, no computers, no nothings. We got a
13    tablet, but alls we can do is call on that or pull up,
14    like, legal mail. All this stuff is locked up in the
15    boss's office at all times.
16 Q  Well, and that's the only -- the issue I'm having is
17    locating a copy of the form that was attached to your
18    complaint anywhere else in the record. I haven't been
19    able to do so, and that's why I'm asking the questions
20    about it. That, and it's in a different format than the
21    Department of Corrections has in their records.
22 A  I can't help what they print out. That's what they give
23    me.
24 Q  All right. I want to go back to the first day in the
25    shop. Did John Story provide direct training to you on

Page 26

1     any individual piece of equipment?
2  A  The -- He started on, like, the torch and stuff, and then
3     he give Troy the stuff, unlocked it. Troy showed me how
4     to use the torch, stuff like that. Basically, he unlocked
5     the stuff and was there when Troy was showing me how to
6     use the stuff. He's another welder and their supervisor
7     that was in the shop.
8  Q  For the most part -- What's Troy's name again, last name?
9  A  Hause.
10 Q  For the most part, Troy Hause did the hands-on training
11    with you?
12 A  Yes. John was there, but he basically showed you how to
13    use the tools, because he used them every day.
14 Q  And were there general rules about training and use of the
15    machines in the shop?
16 A  As far as what?
17 Q  Were you required to be trained on a machine prior to
18    using it?
19 A  No. They said they give us a job, we got to use the tools
20    to do our job. Because John Story went to have surgery.
21    We had another boss fill in, which was Marcus. So we had
22    three different bosses within five days.
23 Q  Okay. And when you say Marcus Ditsworth came to fill in,
24    do you recall about the time frame that he would have
25    filled in for John Story?

Page 27

1  A  That day I smashed my fingers.
2  Q  Was that the first day that he was there?
3  A  Yes.
4  Q  And if we go off here, I think all the reports in the
5     record -- that would have been June 13 of 2017, correct?
6  A  Yes.
7  Q  So you had been working in the machine shop a little over
8     two months at that time.
9  A  Yes. No, I wasn't in the shop for two months when Marcus
10    was there. It was only, like, two weeks.
11 Q  No, I mean you had been working in the shop about a little
12    over two months total at the time you were --
13 A  Two different shops.
14 Q  Okay.
15 A  One was a wood shop. One was a metal shop.
16 Q  All right. And to clarify the record, your signature --
17    your training forms, both that's attached to your
18    complaint and that's been marked as Exhibit 3 identified,
19    I think your first day in the shop was April 4th of 2017.
20 A  Yes.
21 Q  And then you were hurt on June 13th of 2017.
22 A  Yes.
23 Q  Okay. And from April 4th of 2017 through June 13th of
24    2017, you were working in the machine shop, correct?
25 A  Yes.

Page 28

1  Q  And Marcus Ditsworth had only been supervising the machine
2     shop, filling in for Mr. Story, a short period before you
3     were hurt.
4  A  Yes.
5  Q  How were projects assigned and roles assigned within the
6     machine shop?
7  A  Boss gets something put on his desk; he calls you in,
8     gives you the paper, says, "Here, this has got to be done
9     by such-and-such date"; and you go make it.
10 Q  And he would do that on an individual inmate basis?
11 A  Yes. We get done with one project, we go in his office,
12    say, "That one's done. What else you got?"
13 Q  Okay. And did you get a new project on June 13, 2017, or
14    is that a project that you had been working on?
15 A  No. It was a project that another inmate was working on.
16    I was cutting some gussets for his machine. Because it
17    was a project that was supposed to be, I guess, a hurry
18    project for holding the computers, so they wanted to hurry
19    up and get them done because they needed three of them.
20 Q  So what led to you using the metal shears?
21 A  I was told to go cut metal on them. You can't cut gussets
22    with any other machine.
23 Q  Did someone direct you to cut gussets?
24 A  No. As far as what? Somebody told me to go cut them
25    or --

Page 29

1  Q  Correct.
2  A  Yes. Troy Hause told me to go cut them.
3  Q  Okay. And did you tell Troy that you hadn't been trained
4     on that machine?
5  A  I did.
6  Q  What did Troy say?
7  A  He said, "You'll be all right. Go ahead."
8  Q  Did you inform Marcus Ditsworth at that time --
9  A  I --
10 Q  -- you hadn't been trained on the machine?
11 A  I did not. The thing is, when you're in here, you're told
12    to do something, if you don't do it, you get wrote up and
13    go into the hole for refusing to work.
14 Q  But if I understand your testimony correctly, Mr. Hause
15    would have directed you to do it, and you informed him
16    that you weren't trained on the machine.
17 A  Yes. Marcus had told Troy, "Get somebody to help you do
18    this and have him help you make these parts so it can get
19    done by the end of the day." So the main order come from
20    Marcus.
21 Q  But there's no reason to believe that Marcus knew that you
22    weren't trained on this machine, correct?
23 A  No. He was just there for a day.
24 Q  And other than John Story's -- I want to kind of go back
25    to John Story and your allegations concerning Mr. Story.

Page 30

1     Other than his role as the general machine shop
2     supervisor, did he have any direct role in your completing
3     the manufacture of the gussets that you were working on
4     the date you were injured?
5  A  Did he have anything to do with it?
6  Q  Right.
7  A  It was a project that was in his office, so --
8  Q  Okay. But did he direct you to do that?
9  A  He was not -- he was not there the day.
10 Q  And he wouldn't have had any knowledge about the
11    particular job that you were completing on that day?
12 A  No.
13 Q  And he wouldn't have known that you were even the person
14    cutting the gussets.
15 A  Right. It's just whoever Marcus give the job to and
16    somebody to help do it so they can get it done by the end
17    of the day.
18 Q  Did you ask Mr. Hause for training on the metal shear?
19 A  Yes.
20 Q  And what did he tell you?
21 A  "We'll get to it at a later date."
22 Q  How many inmates work in the metal shop?
23 A  Thirteen.
24 Q  Is that kind of a fixed number on any given day?
25 A  Well, there's a machinist back there. It's pretty much

Page 31

1     the same people all the time. They got one, two, three,
2     four -- they got five welders. Five welders, a machinist,
3     two electronic guys.
4  Q  What was your primary role when you were working in the
5     machine shop?
6  A  Welder.
7  Q  That's because you've got experience as a welder?
8  A  (Moves head in affirmative manner.)
9  Q  Is that a yes?
10 A  Yes.
11 Q  All right.
12           (Exhibit 2 marked.)
13 Q  (BY MR. ABRAHAM) Jason, I just handed you what's been
14    marked as Deposition Exhibit 2. You've probably never
15    seen this document in this form. Is that a fair summary?
16 A  Yes.
17 Q  The picture, the top picture on page 1 of Exhibit 2, would
18    it be fair to state that's the metal shear that you
19    injured your fingers on?
20 A  One similar to that.
21 Q  So is this not the shear that you were injured on?
22 A  I don't know if this is our machine shop. That could be
23    anybody's metal shop.
24 Q  Well, I'll represent to you for purposes of this
25    deposition that this is a photo of, I believe, the metal

Page 32

1     shear that exists in the machine shop at the state
2     penitentiary.
3  A  Okay.
4  Q  Do you have any reason to believe that it's not?
5  A  No.
6  Q  Okay. Does it look --
7  A  Yeah, it looks the same.
8  Q  -- the same as the one that you were injured on?
9  A  Yes.
10 Q  Were there multiple metal shears in the machine shop?
11 A  Yes.
12 Q  Were they identical to each other, or they were different
13    metal shears?
14 A  No. They're different.
15 Q  What was the difference between those metal shears?
16 A  Just a different brand of machine. One was -- the saw on
17    the other side, it was just, I guess, an older model.
18 Q  Would it be fair to state, though, you were injured on a
19    Cincinnati --
20 A  Yes.
21 Q  -- metal shear just like the one that's pictured in the --
22 A  Yes.
23 Q  -- top picture? Okay. And I'd ask you to take a look at
24    page 3 of Exhibit 2. And on the bottom photograph on
25    page 3 of Exhibit 2, there's a Machine Shop Equipment

## Page 33

1 Safety Instructions for the metal shears. Do you see
2 that?
3 A Yes.
4 Q That's the same safety instructions that are posted on the
5 metal shears themselves, correct?
6 A No.
7 Q Okay.
8 A This is first time I've seen this paper.
9 Q So you've never previously seen the Machine Shop Equipment
10 Safety Instructions for the metal shears?
11 A No.
12 Q Now --
13 A Where on the machine is this?
14 Q I believe it's on the back side of the machine, but we can
15 have somebody else establish that.
16 So you've never seen the safety instructions?
17 A Why would they put the safety operations on the back of
18 the machine? Nobody uses the back of the machine. They
19 use the front.
20 Q So you've never seen that --
21 A No.
22 Q -- photograph that's the bottom photograph on page 3 of
23 Exhibit 2?
24 A No.
25 Q Have you ever seen similar safety instructions on other

## Page 34

1 pieces of equipment in the machine shop?
2 A Yes. Well, not on the machines. They had it -- they
3 posted one over by the -- kind of by the sink for the
4 lathe.
5 Q For the what?
6 A For the lathe.
7 Q Okay. Have you ever seen any other Machine Shop Equipment
8 Safety Instructions for other pieces of equipment?
9 A Just the ones that I was trained on.
10 Q Would it be fair to say that every piece of equipment that
11 you were trained on had a similar Machine Shop Equipment
12 Safety Instruction for that machine?
13 A Yes.
14 Q Did you look to see whether the metal shears had a Machine
15 Shop Equipment Safety Instruction on them prior to using
16 the equipment?
17 A I did not.
18 Q All right. Next I'd ask you to refer back to the front
19 page there -- page of Exhibit 2. And again, the top
20 photograph on page 1 of Exhibit 2 identifies a Cincinnati
21 brand metal shear, correct?
22 A Yes.
23 Q Cincinnati is just the equipment manufacturer?
24 A I believe so.
25 Q And do you see to the left of the large branded

## Page 35

1 "Cincinnati" on the top of the machine there is -- looks
2 like an instruction or a warning label that's yellow at
3 the top?
4 A Yes.
5 Q I acknowledge you can't read it in this photograph.
6 Correct?
7 A Yes.
8 Q Did you read the contents of that label prior to operating
9 the machine?
10 A I did not.
11 Q Why not?
12 A I was just told to go use this machine and cut the metal
13 and bring it back to them. Nobody told me to read
14 nothing. And when you're told to do something, you either
15 do it or you lose your job and go to the hole.
16 Q So you believe if you had read the warning label on the
17 machine, you would have lost your job?
18 A No. If I would have read it -- I guess I really didn't
19 see it at the time.
20 Q And do you see to the right of the Cincinnati label
21 there's also a "Danger" warning placard?
22 A Yes.
23 Q It's red at the top?
24 A Yes.
25 Q Has white lettering that says "Danger," correct?

## Page 36

1 A Yes.
2 Q Did you read that sign prior to operating the Cincinnati
3 metal shear?
4 A No. Every machine in the shop has a "Danger" sign on it.
5 Q That's because the equipment is dangerous?
6 A Yes.
7 Q Had you ever used this metal shear prior to June 13, 2017?
8 A I have not.
9 Q So if you hadn't used the metal shear previously and there
10 was a warning and a "Danger" placard on the machine, why
11 didn't you read them?
12 A I just went to cut metal. I was concentrating on the job
13 I had at hand.
14 Q And no one instructed you not to read the warning labels,
15 correct?
16 A No. Nobody instructed me how to use it, either.
17 Q And you didn't tell anyone that you hadn't been trained on
18 it prior to using it?
19 A No, I told Troy Hause.
20 Q Okay. Mr. Hause is another inmate, correct?
21 A Yes.
22 Q Now, you didn't refer -- you didn't tell that to Mr. Story
23 or Mr. Ditsworth, correct?
24 A Didn't what?
25 Q Didn't tell Mr. Story or Mr. Ditsworth that you hadn't

1 been trained on the machine?
2 A No, I had not.
3 Q All right. Next, Mr. Dunkelberger, I would ask you to
4 take a look at page 2 of Exhibit 2. I kind of -- and I'm
5 just trying to get a handle on exactly how your fingers
6 were injured. Did you wear gloves on the date that you
7 were injured?
8 A I did.
9 Q So would they have been gloves that look similar to what
10 are depicted in the top picture on page 2 of Exhibit 2?
11 A Yes.
12 Q And would it also be a fair summary to state that your
13 fingers got under one of the, I guess, cylinders that the
14 individual that's depicted in that same photograph is
15 sticking their fingers under?
16 A Yes. There's no cylinder out there right now. It's just
17 wide open. The cylinder comes down after you step on the
18 pedal.
19 Q Right. And so in this photograph -- it's labeled
20 Photo #3, but it's the top photo on page 2 of Exhibit 2.
21 The metal shears had not been activated, correct?
22 A Do what?
23 Q The metal shears had not been put into use?
24 A No.
25 Q And the way that you use the metal shears -- tell me if

38

1 I'm wrong here, but the way that you would utilize the
2 metal shears is you would align the piece of metal that
3 you're going to cut underneath the cutting edge of the
4 shear, correct?
5 A Yes.
6 Q And the cutting edge of the shear, at least as depicted in
7 Photo #3, is the portion that has sort of a jagged yellow
8 cutout?
9 A The one in the far back, with all the yellow teeth.
10 Q Yeah.
11 A The cutting edge is behind that.
12 Q Right. The yellow teeth isn't what actually cuts the
13 metal, correct?
14 A No.
15 Q The cutting edge is behind that, so you'd align your metal
16 that you are going to cut into your gussets under that
17 cutting edge and then depress a foot-activated pedal?
18 A Yes.
19 Q And then the pedal would cause both the cylinders in
20 front, that the individual in this photograph has his
21 fingers under, as well as the cutting edge to come down?
22 A Yes.
23 Q The cylinders sort of act as a -- to hold the piece of
24 metal in place?
25 A Yes.

39

1 Q If it's large enough.
2 A Yes.
3 Q But you weren't aware, at the time you were using it, that
4 the cylinders came down.
5 A No, sir.
6 Q Otherwise you wouldn't have got your fingers under there.
7 A Right.
8 Q So would it just be a fair summary that you were holding
9 the metal you were going to cut into gussets under the
10 cutting edge and got your fingers under the cylinder,
11 depressed the pedal, and it amputated the ends of your
12 fingertips?
13 A Yes.
14 Q That was on your left hand; is that correct?
15 A Yes.
16 Q And what hand are you dominant?
17 A Left.
18 Q So if you look at page 4 of Exhibit 2, is that your
19 finger -- or that is your hand after the injury?
20 A Which one are we on?
21 Q Page 4 of Exhibit 2.
22 A Yes.
23 Q And if you look at page 5 of Exhibit 2, that also depicts
24 your head in the photograph as well, correct?
25 A Yes.

40

1 Q It looks like you lost a good share of the tip of your
2 index finger on your left hand. Correct?
3 A Yes.
4 Q And it looks like you lost a bit less of your middle
5 finger on your left hand. Is that correct?
6 A Yes.
7 Q So what occurred immediately after the cylinder comes down
8 and severs the end of your fingers?
9 A What do you mean, "happened"?
10 Q Did you go inform Ditsworth? Did you yell out in pain?
11 What happened?
12 A I went over and told Jeremy Albers.
13 Q Who is Jeremy Albers?
14 A Another inmate. And then he told Marcus that I'd smashed
15 my fingers. Because they had to take me up to Health
16 Services because this middle finger was squirting blood.
17 Q So immediately after you're injured, you report it to
18 another inmate, correct?
19 A Yes.
20 Q Both you and that inmate then go to Marcus Ditsworth,
21 correct?
22 A Yes.
23 Q And does Ditsworth then call for assistance, or what
24 happens?
25 A No. He takes me right up to Medical.

1 Q Okay. So he walked you immediately over to Medical?
2 A Yeah. We wrapped a rag around my hand.
3 Q And then he passes you off to Medical?
4 A Yes.
5 Q And goes back to the shop?
6 A Yes.
7 Q And would it be a fair summary to state that that's the
8   limit of Mr. Ditsworth's involvement concerning the
9   medical care you received?
10 A Yes.
11 Q So in regard to the allegations in your complaint that
12   related to medical services, gloves, things like that,
13   you'd agree that Mr. Ditsworth didn't have anything to do
14   with that.
15 A For medical service?
16 Q Right.
17 A No.
18 Q He immediately took you over to Medical and got you
19   treated?
20 A Yes.
21 Q And from the point where he passed you off, from a
22   custodial standpoint, he didn't have any involvement with
23   that.
24 A No.
25 Q And would it be a fair summary that you don't have any

1   criticism of at least the medical care that Mr. Ditsworth
2   assisted you with?
3 A No.
4 Q It was limited, and he just passed you off to someone who
5   was qualified --
6 A Yes.
7 Q -- to provide care.
8 A Yes.
9 Q And you'd agree that Mr. Story, as far as the provision of
10   medical care, really didn't have any involvement at all in
11   that.
12 A None.
13 Q Neither of those individuals oversee whether you get
14   gloves or additional treatment, correct?
15 A No. They make -- in the shop, they're the ones that give
16   you gloves.
17 Q Right. And I actually correct that -- or clarify that.
18   Part of your complaint referred to receiving warm gloves
19   where your fingers had been severed, correct?
20 A Yes.
21 Q And you'd received work gloves when you were working in
22   the metal shop, correct?
23 A Yes.
24 Q The warm gloves you referred to in your complaint are
25   different from the work gloves, correct?

1 A I wanted any kind of gloves.
2 Q Okay. Did you receive work gloves when you were working
3   in the metal shop?
4 A Yes.
5 Q And did you go back to work in the metal shop after your
6   fingers were severed?
7 A Next day.
8 Q And did you get new work gloves when you were back that
9   next day?
10 A No. I used the same ones.
11 Q Okay. So you had the same ones that --
12 A Yeah. There was no blood in them or nothing.
13 Q Just came down and severed it clean?
14 A Yep.
15 Q Okay.
16 A Once I pulled my hand out of the glove, then my finger
17   started squirting blood.
18 Q So it didn't actually cut your glove. It was the
19   compression of the cylinder that severed the fingers.
20 A Yes.
21 Q In any event, you still had gloves to wear for purposes of
22   carrying out your machine shop duties after you were
23   injured?
24 A Yes.
25 Q Do you recall when Mr. Story came back to supervise the

1   machine shop?
2 A I do not, sir.
3 Q And how long would you have remained -- I guess I'll call
4   it employed at the machine shop?
5 A Till about two months ago.
6 Q Okay. So it's July of 2021. So would it be a fair
7   summary to say May of 2021?
8 A Yes.
9 Q Is that due to your transfer here to Mike Durfee State
10   Penitentiary?
11 A Yes. Pheasantland Industries had a hold on me for the
12   work I was doing; and then after my lawsuit paperwork went
13   through, I got fired the next day.
14 Q Okay. When you say Pheasantland Industries had a hold on
15   you, what do you mean by that?
16 A They put a hold on me so they wouldn't transfer me down
17   here.
18 Q Because they were having you work there?
19 A Yes. Because I was the head -- I was head of the paint
20   booth and making fire cabinets.
21 Q And you filed this complaint, it looks like, back in June
22   of 2020?
23 A Yes.
24 Q And then the summons was issued in February of 2021. Do
25   you recall that?

## Page 45

1  A  I don't recall.
2  Q  Okay. Well, if the summons has a date on it, you wouldn't
3     argue with the date listed --
4  A  No.
5  Q  -- fair? Okay. What's the process for transferring down
6     here to the Mike Durfee State Penitentiary?
7  A  They pop your door and give you a box, and the next day,
8     you're down here.
9  Q  Okay. I mean, do you ask to be transferred?
10 A  No. There's no asking about it. You go, or you go to the
11    hole.
12 Q  Okay. Is there a classification that occurs that allows
13    you to be transferred down here?
14 A  Yes.
15 Q  What is the nature of that, based on your knowledge?
16 A  Just the nature of your crime. They give you so many
17    points for the crimes you got, and I think it's anything
18    over 13 points, you stay on the Hill; 18 points, you go to
19    Jameson; but anything under 13, I believe you come here.
20 Q  Okay. That's --
21 A  And after five years, so many points drop off every year.
22 Q  And that's based on their classification system to
23    determine what risk you are?
24 A  Yes. I have no idea how they do all that, but...
25 Q  Fair enough. Whatever it may be, you eventually passed to

## Page 46

1     a situation where you could be transferred down here?
2  A  Yeah. I could have transferred a year before I got
3     transferred down there. Pheasantland Industries had a
4     hold on me, and the day I got fired is the day she lifted
5     the hold, and two days later I was down here.
6  Q  When you say the day you got fired, did someone tell you
7     you no longer worked there?
8  A  Yes.
9  Q  Okay. Who told you that?
10 A  James Elledge.
11 Q  Who was that?
12 A  I had given another inmate six bed risers for a bed. They
13    said I didn't have permission to give them to him, so I
14    got a write-up. So they fired me for the write-up. The
15    write-up got dropped, so by their policy I'm supposed to
16    get my job back. And I was informed if I get a job at
17    Pheasantland Industries, I'll be fired immediately.
18 Q  And who told you that?
19 A  That's what the coordinator told me. Because the machine
20    shop boss called and wanted me back over there because
21    they didn't have a painter at the time. He tried to get
22    me back over in the shop twice.
23 Q  What was the date you were fired?
24 A  May something.
25 Q  And you believe that had something to do with this

## Page 47

1     lawsuit?
2  A  Yeah.
3  Q  Okay. Is this the only lawsuit you have pending?
4  A  Yes.
5  Q  And I'm just trying to link that to some of the dates
6     because they -- And that's fair enough. But it was -- do
7     you recall the date in May?
8  A  I do not.
9  Q  But it was May of 2021?
10 A  I think so. I'm not real sure, but I think so.
11 Q  Okay. And from the date that you said you were fired to
12    when you were transferred down here to the Mike Durfee
13    State Penitentiary, how many -- what was the period of
14    time that elapsed?
15 A  I think it was two weeks. She got the hold lifted. It
16    was two days after she lifted the hold, but I was in my
17    cell for two weeks.
18 Q  Okay.
19 A  Because they said that the -- the PI director did not want
20    me working at Pheasantland Industries.
21 Q  And do you recall getting a -- or filling out a
22    change-of-address form?
23 A  Yes.
24 Q  I'm not going to mark this, but I'm going to show it to
25    you. Does this look like the change-of-address form that

## Page 48

1     you completed?
2  A  Yes.
3  Q  And that's been filed as Document -- or as Docket Number
4     21 in the federal case. I don't know if you get a copy of
5     that, but it ends up -- I'll show it to you. Marked at
6     the top is "Document 21" when it gets filed.
7  A  Okay.
8  Q  I don't know if you've seen those numbers previously.
9  A  I have not.
10 Q  Okay. And this document indicates that it was filed by
11    the court on May 21st of 2021. So you must have submitted
12    it sometime prior to that, correct?
13 A  Same day that I got down here, I started filling it out.
14    So the next day, I think I mailed it.
15 Q  Okay. And I believe the date underneath your signature
16    there is May 16, 2021?
17 A  Yep. Yes.
18 Q  Correct?
19 A  Yes.
20 Q  So that would have been the day that you --
21 A  That would have been the day before I got here.
22 Q  Okay. So that would have been your last day at the Hill,
23    correct?
24 A  Yes.
25 Q  ==So how many pieces -- on the date you were injured, how==

1 many pieces did you try to cut prior to suffering your
2 injury?
3 A How many had I cut before that?
4 Q Yes.
5 A I'd cut, like, 20 of them.
6 Q It's the first time you had gotten your finger underneath
7 the cylinder?
8 A Yes.
9 Q And I presume you hadn't noticed prior to that point that
10 the cylinder was depressing when you were pressing the
11 pedal down?
12 A No. He had -- he had 20 squares cut for me. I had to cut
13 the squares in half to get the gussets.
14 Q Was this the last one?
15 A I don't remember.
16 Q Doesn't really matter.
17 So I want to talk a little bit about your fingers and
18 your treatment. So you'd previously testified that
19 Mr. Ditsworth had walked you over to Medical, correct?
20 A Yes.
21 Q What happened after Mr. Ditsworth left you at Medical?
22 A I sat upstairs for about 90 minutes, and then I went to
23 Avera.
24 Q Did anyone there in the medical department at the
25 penitentiary help you prior to transferring you to Avera?

1 A They wrapped my hand up in a towel.
2 Q They have you elevate it or apply pressure?
3 A I put it on my chest.
4 Q Were you in a bed? On a gurney, in a bed? What were --
5 A I was laying on the little bed thing that they had up
6 there.
7 Q And then someone transferred you over to Avera?
8 A Yes, once they got an orange jumpsuit and got me
9 transferred.
10 Q Okay. So you had to put on an orange jumpsuit before you
11 could be transferred to Avera?
12 A Yep. Orange jumpsuit, cuffed up, and taken out to the
13 van.
14 Q And did they manage to control the bleeding?
15 A No. They just had it wrapped up in the towel. It was
16 still bleeding.
17 Q Did anyone locate the severed portions of your fingers?
18 A Somebody did. They dumped it out of my glove.
19 Q Did that go along with you to Avera?
20 A Yes.
21 Q So you were transported, then, to the Avera emergency
22 room; is that correct?
23 A Yes.
24 Q Do you recall who treated you at the Avera emergency room?
25 A I do not.

1 Q In any event, you received treatment there for your
2 fingers. Correct?
3 A Yes.
4 Q Did anybody tell you that they couldn't be attached, or
5 what did they generally tell you?
6 A Doctor said they were smashed too much and couldn't
7 reattach them, they would have to be amputated.
8 Q So then did he proceed to essentially clean up the
9 amputation?
10 A He put me to sleep, so I don't know about them after that.
11 Q So is it a fair statement to say that last you knew, did
12 you look at --
13 A I had to sign paperwork for -- blood transfusion paperwork
14 in case I needed a blood transfusion. Once I got all that
15 stuff signed, then they put me to sleep.
16 Q As far as the condition of your finger, last you recall,
17 pages 3 and 4 of Exhibit 2 was how your finger was. Then
18 you went under the knife.
19 A Yeah.
20 Q They put you out, and you were completely under anesthesia
21 at that time.
22 A Yes.
23 Q Woke up, and they had cleaned up your amputation and
24 stitched your fingers?
25 A At that time, I didn't know. They put -- wrapped it up

1 with, like, cotton and put something on it so I couldn't
2 get it off.
3 Q So you didn't --
4 A I'd never seen it.
5 Q Okay. Got you. Few days later before you ever saw your
6 fingers, or what was the time frame?
7 A When they took the cast off. That was, like, two weeks.
8 Q Did you have a hard cast on over the top?
9 A No. They put two little -- it's like a little hard cast
10 just over the fingers. Because they wouldn't let them put
11 splints on them.
12 Q Prior to, I guess, going under anesthesia, you visited
13 with a physician, and he told you what he intended to do,
14 and you agreed with his course of treatment?
15 A Yes.
16 Q Do you have any concerns or criticisms with the treatment
17 you received from Avera?
18 A No.
19 Q And I believe it was the same day you were then
20 transported back to --
21 A Yeah. 3:30, I was back in my cell.
22 Q Woke up and went to work the next day?
23 A Yes.
24 Q Did you go to some type of light duty or different duty?
25 A I was doing inventory.